# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

SYLVIA LYNNE SHAWLEY,　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiff,　　　　　　)　　　Civil Action No. 20-710
　　　　　　　　　　　　　　　　　)　　　Magistrate Judge Maureen P. Kelly
　　　　　v.　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)　　　Re: ECF No. 39
JIM SHORKEY 1 WHITE OAK, LLC, *doing*　)
*business as* JIM SHORKEY AUTO GROUP　)
*also known as* JIM SHORKEY FAMILY　　)
AUTO GROUP,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　)
　　　　　　　Defendant.　　　　　　)

## MEMORANDUM OPINION

Plaintiff Sylvia Lynne Shawley ("Shawley") brings this action against her former employer under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e-1, *et seq.* ("Title VII"), the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA"), and the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"), arising out of allegations that she suffered harassment, discrimination and retaliation because of her sex and disability.

Presently before the Court is a Motion for Summary Judgment filed by Defendant Jim Shorkey 1 White Oak, LLC ("Jim Shorkey"). ECF No. 39. For the reasons below, the Motion for Summary Judgment is granted in part and denied in part.[1]

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties voluntarily consented to having a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. ECF Nos. 7 and 10.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

#### 1.  Shawley's employment at Jim Shorkey

Jim Shorkey hired Shawley as a Human Resources ("HR") Manager on February 10, 2015. ECF No. 37 ¶ 1.  Her title was later changed to HR Director.  Id.

As HR Director, Shawley managed HR tasks for 500 employees at seven Jim Shorkey locations.  ECF No. 43 ¶ 12.  Her responsibilities included: onboarding employees; enrollment of health benefits; conflict resolution; investigating allegations of misconduct; unemployment compensation claims; answering phone calls from employees; corporate compliance; and handling ADA and FMLA claims.  ECF No. 37 ¶ 36.  Shawley also supervised multiple HR employees, including Heather Weinberg ("Weinberg"), Nicole Hayes ("Hayes"), and Karen Gourdie ("Gourdie").  ECF No. 43 ¶ 83.  This position required computer skills, including knowledge of the Microsoft Office suite of products.  ECF No. 37 ¶ 38.

Shawley worked out of a Kia dealership in North Huntingdon, Pennsylvania ("North Huntingdon location"), where she had an open-door policy for employees.  Id. ¶ 2; ECF No. 43 ¶ 17.  She could access certain HR systems remotely, as needed.  ECF No. 43 ¶ 18; ECF No. 44-7 at 6.

#### 2.  Shawley's relationship with Brian Yarlett

Brian Yarlett ("Yarlett") has worked at Jim Shorkey for over 26 years.  ECF No. 37 ¶ 3. He was hired as a mechanic, and he became the Maintenance Manager in 2014.  Id.  Yarlett performs his job at various Jim Shorkey dealership buildings, including the North Huntingdon location.  Id.  As a result, Shawley sometimes saw Yarlett at work.  Id.  Jed Michael ("Michael"),

the General Operations Manager, supervised both Yarlett and Shawley during the relevant time period. Id. ¶¶ 3, 5.

In November 2016, Yarlett and Shawley began a consensual, romantic relationship. Id. ¶ 7. Both Yarlett and Shawley were married to others when their relationship began. Id.

In August 2017, Shawley and Yarlett disclosed their relationship to Michael. Id. ¶ 9. Shawley offered to, but did not, resign from her position at that time. Id. Jim Shorkey management did not object to their relationship, and it was not prohibited by company policy. ECF No. 43 ¶¶ 24, 27.

As Shawley and Yarlett's relationship progressed, they discussed separating from their spouses and moving forward exclusively with each other. Id. ¶ 20. Shawley filed for divorce and moved out of her home. ECF No. 44-2 at 7.

On June 11, 2018, Yarlett abruptly ended his romantic relationship with Shawley. ECF No. 37 ¶ 13.

### 3. Shawley's communications with Michael on June 11, 2018

After Yarlett ended their relationship the morning of June 11, 2018, Shawley texted Michael to call off of work that day. Id. ¶ 14. She also spoke with Michael on the phone, and he visited her in person at her home. Id. ¶ 16. Shawley told Michael that she was devastated and did not know how she could be around Yarlett. Id. She requested to work from a different location, such as her home, Panera Bread Company, or the North Hills or Uniontown dealership locations, so that she would not have to work around Yarlett. Id. ¶ 24; ECF No. 38-1 at 27.

Shawley claims that Michael told her she would have no problem getting a bartending job with her "who-ha or [her] tatas." ECF No. 37 ¶ 17. At the end of their meeting, Shawley hugged Michael and told him that she loved him. Id. ¶ 18.

### 4. Termination of Shawley's employment

The next day, Michael met with Shawley at work. ECF No. 43 ¶ 48. During this meeting, Shawley sent the following email to Michael:

> Effective today June 12, 2018 I am resigning my position here at the Jim Shorkey Family Auto Group for personal reasons. I am extremely grateful to the group for the opportunity to be part of something so exciting. I am extremely sorry for my shortcomings and the effect on the organization.

ECF No. 37 ¶ 19; ECF No. 38-7.

Despite this, Shawley claims that she did not intend to resign her employment, that Michael directed her to send a resignation email, and that she did not resign voluntarily or willingly. ECF No. 43 ¶ 49. Instead, she claims that management forced her to resign in order to receive money that she was owed. Id. According to Shawley, Michael told her that Jim Shorkey wanted to "sever ties with [her]" because "it would create too much gossip." ECF No. 44-2 at 20.

After Shawley sent this email, Michael took her to the common area to say goodbye to her coworkers. ECF No. 43 ¶ 54. In front of a group of female co-workers, Michael said that Shawley would have no trouble getting a bartending job with her "tatas." Id. One of Shawley's subordinates, Hayes, said that Michael's comment about Shawley being "well endowed" made her "uncomfortable." Id. ¶ 56

At 6:45 p.m., Shawley texted Michael: "Hi! Not one person supporting me is in agreement of resignation???" ECF No. 37 ¶ 20.

Yarlett was not terminated. He continues to work at Jim Shorkey. ECF No. 43 ¶ 63.

### 5. Medical issues

Before her relationship with Yarlett ended, Shawley had a pre-existing diagnosis of anxiety, with a history of panic attacks. Id. ¶ 40. She sometimes managed her anxiety with prescription medication authorized by her treating physician. Id. ¶ 43. No one at Jim Shorkey

knew about her diagnosis before June 2018, except for her co-workers Yarlett and Gourdie, an HR employee.  ECF No. 37 ¶ 23; ECF No. 43 ¶ 59.

Shawley sought mental health treatment after her relationship ended.  On June 11, 2018, she called a crisis hotline.  ECF No. 37 ¶ 15.  Several days later, she sought treatment for depression and anxiety at the Excela Hospital emergency room.  Id. ¶¶ 21-22.

### 6. Compensation

#### a. Meeting with Jim Shorkey IIII and Russell Shorkey on May 16, 2018

On May 16, 2018, Shawley met with Jim Shorkey III and Russell Shorkey to discuss her compensation.  Id. ¶ 10.  Jim Shorkey III and Russell Shorkey are co-owners of Jim Shorkey.  Id. ¶¶ 4, 6.  Jim Shorkey III is the Chief Operating Officer and handles day-to-day operations for the business.  Id. ¶ 4.  Russell Shorkey is the Chief Financial Officer.  Id. ¶ 6.

Before the meeting, Shawley presented an email with her qualifications and a document from Glass Door that purported to show average salaries for HR Directors from Westmoreland County.  Id. ¶ 11.  During the meeting, she objected to being paid less than two male employees, Reggie Little ("Little") and Andy White ("White").   ECF No. 43 ¶ 32; ECF No. 44-6 at 12.

Jim Shorkey III and Russell Shorkey suggested that it was unprofessional for Shawley to refer to other employees' payroll data for this purpose.  ECF No. 43 ¶ 34.  They declined to increase Shawley's compensation on May 16, 2018, and they asked for Shawley to develop a plan for her role as HR Director in the future.  ECF No. 37 ¶ 12.

#### b. Alleged comparators

Shawley's annual salary in 2018 was $62,499.00.  Id. ¶ 28.  She was paid less than two male employees, Little and White.  Id. ¶¶ 26-28.

### (1) Little

Little's salary in 2018 was $75,000.  Id. ¶ 27.  He was hired as a detailer in 2008.  Id. ¶ 34.  He became a paintless dent removal ("PDR") specialist in 2010, then the PDR Manager in 2018.  Id.  In order to be a PDR Manager, Little was required to know how to perform PDR and to train others to do the work.  Id.  He was sent to school to obtain certifications from vendors so that he could perform the repairs.  Id.

As PDR Manager, Little trained two employees to perform PDR and do interior repairs, and he was also responsible for preparing repair orders.  Id.  At this time, Jim Shorkey increased Little's salary from $53,223.08 to $75,000 to offset incentive pay that Little would lose by training individuals instead of working on vehicles.  Id. ¶ 27.  Little worked out of the North Huntingdon location.  Id. ¶ 34.  He reported to the Body Shop Supervisor, Sean Williams, and his director supervisor was Mike Opal.  Id. ¶¶ 27, 34.

### (2) White

White's salary in 2018 was $65,199.98.  Id. ¶ 26.  White was hired as the Parts Manager in March 2011.  Id. ¶ 29.  He became the Service Manager in 2013.  Id.  White helped to set up the Ford store using his knowledge of the CDK software, an operational software that includes central accounting inventory and parts inventory for the dealerships.  Id. ¶ 30.

White became the Information Technology ("IT") Director in 2016.  Id. ¶ 31.  As IT Director, he was the administrator for the CDK software.  Id. ¶ 32.  His duties included answering IT tickets for employees with computer, email, fax or phone issues, and assisting in special projects to set up software, computers and phones for new dealerships.  Id. ¶ 31.  During the relevant time, White did not supervise anyone.  ECF No. 43 ¶ 89.  His direct supervisor was Russell Shorkey.  Id. ¶ 32.

**B.  Procedural History**

Shawley filed her Complaint on May 14, 2020.  ECF No. 1.  Jim Shorkey filed an Answer.  ECF No. 4.  The parties completed fact discovery by June 25, 2021.  ECF No. 34 ¶ 4.

Shawley asserts five claims: Count I: Sex Discrimination/Sexual Harassment under Title VII; Count II: Disability Discrimination under the ADA; Count III: Retaliation under Title VII; Count IV: Sex Discrimination under the EPA; and Count V: Retaliation under the EPA.  ECF No. 1 ¶¶ 82-142.

**C.  Motion for Summary Judgment**

Jim Shorkey filed the instant Motion for Summary Judgment and Brief in Support on September 3, 2021.  ECF Nos. 39 and 40.  The parties filed a Joint Concise Statement of Undisputed Facts and Appendix.  ECF Nos. 37 and 38.

On October 4, 2021, Shawley filed a Response and Brief in Opposition to the Motion for Summary Judgment, together with a Counterstatement of Facts and Appendix.  ECF Nos. 41, 42, 43 and 44.

Jim Shorkey filed a Reply Brief in support of its Motion for Summary Judgment.  ECF No. 45.  Shawley then filed a Sur-Reply.  ECF No. 48.

The Motion for Summary Judgment is now ripe for consideration.

**II.    LEGAL STANDARD**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Doe v. Abington Friends Sch.,

480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof"). Thus, summary judgment is warranted where, "after adequate time for discovery and upon motion . . . a party . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)).

The moving party bears the initial burden of demonstrating to the court that there is an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 322; Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 140 (3d Cir. 2004). "[W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences, and resolve all doubts in favor of the nonmoving party. Matreale v. N.J. Dep't of Military & Veterans Affairs, 487 F.3d 150, 152 (3d Cir. 2007); Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001).

## III.  DISCUSSION

### A.  Title VI Sex Discrimination/Sexual Harassment (Count I)

Shawley brings a claim of sex discrimination and sexual harassment under Title VII. "Title VII prohibits an employer from discriminating based on an employee's race, color, religion, sex, or national origin, 42 U.S.C. § 2000e-2(a), and from retaliating against an employee for complaining about, or reporting, discrimination or retaliation, id. §2000e-3(a)." Carvalho-Grevious v. Del. State Univ., 851 F.3d 249, 256 (3d Cir. 2017). For the reasons that follow, the Court will deny the Motion for Summary Judgment relative to Count I.

#### 1.  Sex Discrimination

In her Brief in Opposition to the Motion for Summary Judgment, Shawley argues that Jim Shorkey discriminated against her based on her sex relative to: (1) the termination of her employment; and (2) her compensation. ECF No. 42 at 14.

##### a.  Termination

As for the first issue, Shawley claims that Jim Shorkey engaged in discrimination on the basis of sex under Title VII by giving preferential treatment to a male employee, Yarlett, "by allowing him to remain employed by the company" while "terminating Ms. Shawley's employment." ECF No. 1 ¶ 84.

Under the familiar burden-shifting framework[2] established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), Shawley bears the initial burden of establishing a prima facie case of discrimination, after which the burden shifts back to the defendant to present a legitimate, nondiscriminatory reason for its adverse employment decision. Id. at 802. If Jim Shorkey meets

---

[2] The McDonnell Douglas burden-shifting analysis applies when a plaintiff relies on circumstantial, rather than direct, evidence of discrimination. See Weightman v. Bank of N.Y. Mellon Corp., 772 F. Supp. 2d 693, 702-03 (W.D. Pa. 2011).

this burden, the burden of production then shifts back to Shawley to show by a preponderance of the evidence that the reasons offered by Jim Shorkey are pretext for discrimination.  Id. at 804; Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

### (1) Prima facie case

To establish a prima facie case of sex discrimination, Shawley must show that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) it occurred under circumstances that raise an inference of discriminatory action.  Summy-Long v. Pa. State Univ., 715 F. App'x 179, 182 (3d Cir. 2017). The "central focus" of this analysis is whether the employer is treating some people less favorably because of their sex.  Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003).

For purposes of this analysis, the first three elements are not disputed.[3]  Jim Shorkey only challenges the fourth element, arguing that Shawley's alleged termination did not occur under circumstances that raise an inference of discriminatory action.  ECF No. 45 at 3-4.  Jim Shorkey argues that Shawley and Yarlett were not similarly situated, because Yarlett did not demand to be relocated as a result of the break-up of their relationship.   Because there is no evidence a similarly situated employee of the opposite sex was treated more favorably, Jim Shorkey argues that Shawley offers nothing but her own opinion she was discriminated against—which cannot prove her claim.

Jim Shorkey also refers the Court to the decision of the United States Court of Appeals for the Seventh Circuit in Hossack v. Floor Covering Assoc. of Joliet, Inc., 492 F.3d 853 (7th Cir.

---

[3] In its Motion for Summary Judgment, Jim Shorkey does dispute whether Shawley was involuntarily terminated from her position.  However, it does not appear to challenge whether there is sufficient evidence to show that she suffered an adverse employment action for purposes of this analysis.  See, e.g., ECF No. 45 at 3 ("Jim Shorkey is not seeking summary judgment on the basis that Plaintiff resigned but rather on the absence of any evidence in the record as to the fourth prong—circumstances that 'raise an inference of discriminatory action'").

2007), which similarly involved the fall-out after two co-workers ended an affair and the female, but not male, employee involved in that affair was allegedly terminated. Based on the court's finding in <u>Hossack</u> that no reasonable jury could find defendant terminated the female employee because of her sex, Jim Shorkey argues that the same result should apply here.

In response, Shawley argues that summary judgment is improper because there is a question of fact about whether she was terminated. ECF No. 42 at 15. She also argues that male employees used female stereotyping in their decisions, based on Michael's comments that Shawley would have no trouble getting another job because of her breasts, and that her unequal pay supports an inference of discrimination. <u>Id.</u> at 16; ECF No. 48 at 6.

Upon review, there is sufficient evidence to establish the fourth element. "To support an inference of discrimination, employees generally present comparator evidence, or 'evidence that [the employer] treated 'similarly situated' individuals not within [the employee's] protected class more favorably than it treated the employee.'" <u>Mammen v. Thomas Jefferson Univ.</u>, 523 F. Supp. 3d 702, 721 (E.D. Pa. 2021) (citing <u>Darby v. Temple Univ.</u>, 216 F. Supp. 3d 535, 542 (E.D. Pa. 2016) (quoting <u>Wilcher v. Postmaster Gen.</u>, 441 F. App'x 879, 881 (3d Cir. 2011)). Nevertheless, this inference can be shown "in a number of ways," such as "evidence of similar [gender] discrimination of other employees, or direct evidence of discrimination from statements or actions by her supervisors suggesting [gender] animus." <u>Id.</u> (quoting <u>Darby</u>, 216 F. Supp. 3d at 542). The plaintiff's burden at this stage is not "onerous," and "courts should be most flexible when analyzing the inference of discrimination element." <u>Abdul-Latif v. Cty of Lancaster</u>, 990 F. Supp. 2d 517, 528 n. 7 (E.D. Pa. 2014) (citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981); <u>Pivirotto v. Innovative Sys., Inc.</u>, 191 F.3d 344, 357 (3d Cir. 1999)).

In this case, Shawley points to evidence that she was treated less favorably than a male co-worker, Yarlett, when only she was forced to resign to avoid "gossip" after their relationship ended. Because they participated in the same relationship, they are similarly situated in relevant respects. Shawley also points to multiple remarks by Michael within a day of her alleged termination that she could easily find other work because of her breasts. Viewing the record as a whole in the light most favorable to Shawley as the non-moving party, a reasonable factfinder could infer that Shawley's termination was motivated by discriminatory animus.[4]

### (2) Legitimate Non-Discriminatory Reason

Having articulated a prima facie case of sex discrimination, the burden of production shifts back to Jim Shorkey to offer a legitimate nondiscriminatory reason for the adverse employment action. The employer's burden at this stage is "relatively light" and Jim Shorkey need only "introduc[e] evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." Tomasso v. Boeing Co., 445 F.3d 702, 706 (3d Cir. 2006) (quoting Fuentes, 32 F.3d at 763) (internal quotations omitted).

Upon review, Jim Shorkey meets this burden. Jim Shorkey claims that Shawley's employment ended because she voluntarily resigned, and that it had a legitimate reason for accepting her resignation because she refused to work around Yarlett. ECF No. 40 at 5. Because Jim Shorkey's articulated rationale, if believed, proffers a nondiscriminatory reason for Shawley's termination, the Court finds that Jim Shorkey has satisfied its burden at this stage.

---

[4] To the extent Jim Shorkey relies on the Seventh Circuit's decision in Hossack, the Court notes that this case is distinguishable. Because the Seventh Circuit considered Hossack on appeal from a motion for judgment as a matter of law after trial, rather than considering the record at summary judgment, it did not apply the same legal standard the Court must apply here. See Hossack, 492 F.3d at 861. The Seventh Circuit also found there was "uncontroverted" evidence at trial that plaintiff in Hossack was terminated for reasons other than her sex. Id. at 863. At this stage of the instant case, there are questions of fact regarding the reasons for Shawley's separation from employment.

### (3) Pretext

Given that Jim Shorkey has met its burden at step two of the <u>McDonnell Douglas</u> burden-shifting analysis, the burden shifts back to Shawley to show that the stated reason for the adverse employment action was a pretext for sex discrimination.  To establish pretext, Shawley must "point to some evidence, direct or circumstantial, from which a fact-finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely that not a motivating or determinative cause of the employer's action."  <u>Tomasso</u>, 445 F.3d at 706 (quoting <u>Fuentes</u>, 32 F.3d at 764) (internal quotations omitted); <u>Doe v. C.A.R.S. Prot. Plus, Inc.</u>, 527 F.3d 358, 370 (3d Cir. 2008) ("Put another way, to avoid summary judgment the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact-finder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).").

Upon review, there is sufficient evidence of pretext.  Shawley points to evidence that would allow a jury to disbelieve Jim Shorkey's claim that she voluntarily resigned.  Shawley testified that Michael forced her to resign in order to receive money that she was owed, and that she was told that she was being required to resign to avoid gossip.  Clearly, there is a material dispute as to whether Shawley resigned or was terminated such that it should be submitted to the jury for determination.  As a result, the Motion for Summary Judgment is denied as to Shawley's Title VI sex discrimination claim for her alleged termination.

### b.  Compensation

In her Brief in Opposition, Shawley argues that her Title VII claim in Count I also arises out of her disparate treatment by unequal compensation.  She contends that she was treated

differently than similarly situated male employees because she received lower wages.  ECF No. 42 at 14.

In its Brief in Support of the Motion for Summary Judgment, Jim Shorkey points out that Shawley does not expressly plead a Title VII discrimination claim based on unequal compensation. ECF No. 40 at 15.  While Shawley brings a Title VII retaliation claim arising out of her complaints about unequal compensation in Count III, and she asserts an EPA claim based on equal wages and related retaliation in Counts IV and V, she does not specifically plead in her Complaint an underlying claim under Title VII for sex discrimination based on her compensation.  Rather, in Count I, Shawley pleads that she was "treated inequitably in the terms and conditions of her employment *in that* Jim Shorkey Auto evidenced preferential treatment for the male employee by allowing him to remain employed by the company and terminating Ms. Shawley's employment." ECF No. 1 ¶ 84 (emphasis added).

In her Brief in Opposition, Shawley does not directly address Jim Shorkey's argument. Instead, she "incorporates the factual detail contained hereinafter pertaining the Equal Pay Act . . . ." ECF No. 42.

Upon review of the Complaint, the Court finds that Shawley did not expressly allege unequal compensation or disparate treatment relative to compensation in Count I.  Instead, she referenced only Jim Shorkey allowing Yarlett to remain employed after the relationship ended. ECF No. 1 ¶ 84.

Simply put, Plaintiff is the "master of her complaint," and she chooses which claims and theories of recovery to plead.  Summy-Long v. Pa. State Univ., 226 F. Supp. 3d 371, 387-88 (M.D. Pa. 2016), *aff'd*, 715 F. App'x 179 (3d Cir. 2017).  She may not defeat summary judgment by asserting a claim she did not include in her Complaint.  Id.  "Rather, '[a]t the summary judgment

stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." Id. (quoting Tucker v. Union of Needletrades, Indus. & Textile Employees, 407 F.3d 784, 788 (6th Cir. 2005)).  Therefore, the claim of disparate compensation will only be considered relative to the Title VII retaliation (Count III), EPA (Count IV), and EPA retaliation (Count V) claims.

### 2.  Sexual Harassment

In Count I, Shawley also claims that "Jim Shorkey Auto subjected [her] to sexual harassment in the workplace by telling her she could get a good job bartending because of her breasts."  ECF No. 1 ¶ 87.  She claims that Michael made this statement "to her personally" and "also repeated the statement in front of Ms. Shawley's female coworkers as he was terminating [her].  Id. ¶ 88.

"Title VII protects only against harassment based on discrimination against a protected class; it is not 'a general civility code for the American workplace.'"  Mufti v. Aarsand & Co., Inc., 667 F. Supp. 2d 535, 544 (W.D. Pa. 2009) (quoting Onacle v. Sundowner Offshore Servs, Inc., 523 U.S. 75, 80-81 (1998)).  To establish a hostile work environment claim, Shawley must show that she (1) suffered intentional discrimination because of her protected characteristic; (2) the conduct was severe or pervasive; (3) the conduct detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person in like circumstances; and (5) there is a basis for vicarious liability.  Mandel v. M&Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013).

In support of the Motion for Summary Judgment, Jim Shorkey argues that Michael's comments about Shawley's breasts constitute sporadic incidents of sexually inappropriate

language, and that such comments cannot establish a hostile work environment claim.  ECF No. 40 at 7.

In response, Shawley argues that Michael's comments were objectively and subjectively offensive, pointing to testimony from Hayes that his remarks made her "uncomfortable."  ECF No. 42 at 17.  She also argues this was not simply an off-hand remark; instead, it was a message of "sexual innuendo and discrimination coupled with a termination decision . . . ."  Id.

As discussed, the second element requires a plaintiff to show that the discrimination was "severe or pervasive" to constitute a hostile work environment.  The United States Supreme Court has held that "hostile work environment" harassment must be pervasive or severe enough "to alter the conditions of . . . employment and create an abusive working environment."  Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986) (quoting Henson v. City of Dundee, 682 F.2d 897, 904 (11th Cir. 1982)).  Courts consider the totality of the circumstances, including the "frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it interferes with an employee's work performance."  Mufti, 667 F. Supp. 2d at 545 (citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).

Generally, "offhanded comments and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim."  Caver v. City of Trenton, 420 F.3d 243, 262 (3d Cir. 2005) (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)).  However, an isolated incident may create a hostile work environment if it is sufficiently extreme "to amount to a change in the terms and conditions of employment."   Castleberry v. STI Grp., 863 F.3d 259, 264 (3d Cir. 2017) (quoting Farragher, 524 U.S. at 788); see also id. ("[I]t is clear that one [isolated] incident can suffice to state a claim" as "isolated incidents will amount to harassment if extremely serious"); Thomas v. Bronco Oilfield Servs., 503 F. Supp. 3d 276, 298-99 (W.D. Pa.

2020) ("'Severe or pervasive' is disjunctive, meaning that a sufficiently extreme but nonetheless isolated incident can create a hostile work environment.").

Upon review, the Court finds there is sufficient evidence to raise a question of fact for the jury relative to whether Michael's comments created a hostile work environment. Viewing the facts in the light most favorable to Shawley, Michael made a number of sexually derogatory and demeaning comments to Shawley both individually and in front of her subordinates. While those comments only occurred on two occasions, there are a number of factors that arguably render those comments sufficiently extreme to alter the conditions of Shawley's employment.

Of note, Michael was Shawley's supervisor.[5]  As courts have recognized, "[i]n measuring the severity of harassing conduct, the status of the harasser may be a significant factor . . . ." Boyer v. Liberto v. Fontainebleau Corp., 786 F.3d 264, 278 (4th Cir. 2015).  "Simply put, 'a supervisor's power and authority invests his or her harassing conduct with a particular threatening character.'" Id. (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763 (1998)).  The context of Michael's comments also arguably heightens the severity.  At the relevant time, Michael knew that Shawley was in a fragile emotional state, and he was pressuring her to resign.  Michael also demeaned Shawley in front of her subordinates.  Therefore, the Motion for Summary Judgment is denied relative to Shawley's hostile work environment claim in Count I.

## B. Disability Discrimination under ADA (Count II)

In Count II, Shawley claims that Jim Shorkey discriminated against her based on her alleged disability by failing to grant her requested accommodation to work at another location and by terminating Shawley because of her disability.  ECF No. 1 ¶¶ 94-107; ECF No. 42 at 18-20.

---

[5] The fact that Michael was Shawley's supervisor also distinguishes this case from Benny v. Pa. Dep't of Corr., 211 F. App'x 96, 97 (3d Cir. 2006), on which Jim Shorkey relies.  ECF No. 40 at 7-8.  In Benny, unlike here, the Third Circuit considered whether co-workers' inappropriate sexual remarks created a hostile work environment.

Thus, Shawley appears to proceed on two theories of liability: (1) failure to accommodate; and (2) wrongful termination, based on disability.

### 1. Failure to Accommodate

Congress enacted the ADA to prevent qualified individuals from workplace discrimination based on a disability. Gaul v. Lucent Tech., Inc., 134 F.3d 576, 579 (3d Cir. 1998). Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a) (1995).

An employer violates the ADA when it fails to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless [it] can demonstrate that the accommodation would impose an undue hardship on the operation of the business . . . ." 42 U.S.C. § 12112(b)(5)(A); see also Mercer v. Se. Pa. Transit Auth., 26 F. Supp. 3d 432, 442 (E.D. Pa. 2014) ("An employer's denial of a request for a reasonable accommodation is a discrete act of discrimination that is an independently actionable unlawful employment practice under the ADA.")

To establish a prima facie ADA claim for failure to accommodate, a plaintiff must show (1) she was disabled, and her employer knew it; (2) she requested an accommodation or assistance; (3) her employer did not make a good faith effort to assist; and (4) she could have been reasonably accommodated. Capps v. Mondelez Global, LLC, 847 F.3d 144, 157 (3d Cir. 2017). "Reasonable accommodations" are defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired its customarily performed,

that enable an individual with a disability who is qualified to perform the essential functions of that position." 29 C.F.R. § 1630.2(o)(1)(ii).

The Court first considers whether Shawley can satisfy the first element, which requires her to show that she was disabled and Jim Shorkey knew about it.  Shawley alleges in the Complaint that she suffers from depression and anxiety, and that these medical conditions are qualifying disabilities under the ADA because "they impact her daily life including difficulty sleeping, concentrating, and eating and are continuing in nature." ECF No. 1 ¶ 95.  Shawley also alleges that Jim Shorkey "knew of [her] disability and/or perceived her as disabled such that she would require accommodation under the ADA." Id. ¶ 96.

In support of its Motion for Summary Judgment, Jim Shorkey argues that there is no evidence that Shawley is "disabled," as defined by the ADA.  ECF No. 39 ¶ 72.  Jim Shorkey further asserts that the mere fact that Shawley was "devastated," "distraught" and "upset" by Yarlett's decision to terminate their personal relationship does not result in her being "disabled" within the meaning of the ADA.  Id. ¶ 62.  Further, even assuming Shawley's anxiety and depression were a qualifying disability, Jim Shorkey contends that there is no evidence that it knew about it.  In fact, the parties have stipulated that prior to June 2018, no one at Jim Shorkey, other than Yarlett and Gourdie, was aware of Shawley's diagnosis of depression and anxiety.  ECF No. 37 ¶ 23.

In opposing the Motion for Summary Judgment as to her ADA claim, Shawley argues that medical records produced incident to this litigation establish a pre-existing diagnosis of anxiety, which was managed by her treating physician and, at times, medication. ECF No. 42 at 18.  This diagnosis was known to Yarlett and Gourdie, co-workers of Shawley.  Id.

Shawley argues that on June 11, 2018, the day prior to her termination, Michael, her supervisor, had notice of her disability, because he personally observed her in a "state of crisis" when they met in person on the morning of June 11, 2018. That morning, Yarlett had just abruptly ended their nearly two-year relationship, after Shawley filed for divorce and rearranged her life to pursue her relationship with Yarlett. Shawley testified that she was "crying and sobbing and distraught," and that she was in contact with a crisis counseling center by phone. ECF No. 44-2 at 24.

Upon review, the record does not reflect that Jim Shorkey knew about Shawley's alleged disability. Aside from Shawley being visibly distraught on the morning that Yarlett ended the relationship, she proffers no evidence that she told Michael that she had been diagnosed with or was being treated for anxiety or depression. Shawley does not identify any statement or reaction, however, that would reasonably place Michael on notice that she was manifesting symptoms of disabling anxiety, rather than heartbreak.

Although Shawley argues that Michael saw her have a "panic attack," she does not point to any evidence to support this claim. Shawley did not testify to having a panic attack. Michael also did not testify to observing a panic attack or to seeing her have any difficulty breathing. Instead, he recalled that Shawley was sad and intermittently cried, but "she was very coherent, you know, and we were just talking normally." ECF No. 44-7 at 28-29. For these reasons, construing the evidence in the light most favorable to the moving party, there is not sufficient evidence for a reasonable jury to find that Shawley had a specific disability of which Jim Shorkey was placed on notice on or before June 11, 2018. Thus, Shawley cannot establish a failure to accommodate claim under the ADA.

### 2. Wrongful termination

To present a prima facie case of discrimination under the ADA, a plaintiff must show (1) she is a disabled person under the ADA; (2) she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) she has suffered an otherwise adverse employment decision as a result of discrimination. Gaul, 134 F.3d at 580. "It is well settled that 'termination is an adverse employment action.'" Dreibelbis v. County of Berks, 438 F. Supp. 3d 304, 315 (E.D. Pa. 2020) (quoting Bossi v. Bank of Am., No. 3:14-cv-02301, 2016 WL 4446444, at *3 (M.D. Pa. Aug. 19, 2016)).

Upon review, summary judgment is also proper on this claim. As discussed, Jim Shorkey management did not know about Shawley's disability. Because there is no evidence that individuals who allegedly terminated her knew about her disability, Shawley cannot prove her termination occurred because of her disability. Therefore, she cannot establish the third element of a prima facie case in support of her wrongful termination claim under the ADA. For these reasons, the Court grants the Motion for Summary Judgment relative to Count II.

### C. Retaliation under Title VII (Count III)

In Count III, Shawley claims that Jim Shorkey retaliated against her in violation of Title VII for advising Jim Shorkey of complaints received from employees concerning discriminatory practices and for complaining about disparate pay related to her salary. ECF No. 1 ¶¶ 108-120.

In support of its Motion for Summary Judgment, Jim Shorkey argues that Shawley cannot establish a prima facie case of retaliation under Title VII. Under the McDonnell Douglas burden -shifting framework, a plaintiff asserting a retaliation claim under Title VII must first establish a prima facie case by showing (1) she engaged in protected activity; (2) she suffered adverse action by the employer; and (3) there is a causal connection between the employee's activity and the

employer's adverse action.  Gress v. Temple Univ. Health Sys., 784 F. App'x 100, 105 (3d Cir. 2019).

Here, only the third element of a prima facie case of retaliation under Title VII is in dispute. Jim Shorkey argues there is no nexus or causal link between any protected activity and the alleged adverse action (being forced to resign).  ECF No. 40 at 25.  Jim Shorkey contends that Shawley called off work the day Yarlett broke up with her and voluntarily resigned to avoid working around Yarlett.  Id.

In response, Shawley argues there is evidence supporting a causal connection, given that the timing between her protected activity and the adverse employment action is unusually suggestive.  ECF No. 42 at 27-29.  In particular, Shawley argues that she was forced to resign less than one month after her meeting with Jim Shorkey III and Russell Shorkey relative to her complaint that two male employees, White and Little, were being paid more than her.  Id.  She also points to evidence that Jim Shorkey III and Russell Shorkey expressed displeasure with Shawley for comparing her salary to other employees.  Id.  To the extent that Jim Shorkey claims that she voluntarily resigned, she argues that this is a material fact in dispute.  Id.

Courts consider "a broad array of evidence in determining whether a sufficient causal link exists [for a plaintiff] to survive a motion for summary judgment."  Daniels v. Sch. Dist. of Phila., 776 F.3d 181, 196 (3d Cir. 2015) (internal quotations omitted).  A plaintiff may rely on temporal proximity between the protected activity and the employer's adverse action if the proximity is "unusually suggestive."  Id.  If the temporal proximity is not "unusually suggestive," however, the Court considers "the circumstances as a whole, including any intervening antagonism by the employer, inconsistencies in the reasons the employer gives for its adverse action, and any other

evidence suggesting that the employer had a retaliatory animus when taking the adverse action." Id.

Upon review, the Court notes the temporal proximity between Shawley's May 16, 2018 meeting with Jim Shorkey III and Russell Shorkey (the protected conduct) and her termination on June 12, 2018 (the adverse employment action), less than one month later. The Court finds that Shawley has adduced evidence of a causal connection between her termination and protected activity sufficient to withstand a motion for summary judgment. See, e.g., Wildi v. Alle-Kiski Med. Ctr., 659 F. Supp. 2d 640, 667 (W.D. Pa. Sept. 18, 2009) (decision to terminate made within either two days, or two months, of protected activity could show causal connection), *order vacated in part on other grounds*, 2009 WL 10729564 (W.D. Pa. Nov. 6, 2009) (citing Fasold v. Justice, 409 F.3d 178, 189-90 (3d Cir. 2005) (holding that a time span of "less than three months" is temporally proximate and "an inference of retaliation can be drawn"); Nesselrotte v. Allegheny Energy, Inc., No. 06-01390, 2009 WL 703395, at *13 (W.D. Pa. Mar. 16, 2009) ("Defendants admit that [they] first contemplated suing [plaintiff's husband's company] in October 2004, less than three months after Plaintiff initially complained about [age discrimination], and less than two months after she participated in an investigation into [discriminatory] conduct . . . The short time period between Plaintiff's protected activity and the time during which it first contemplated suing [plaintiff's husband's company] is evidence of a causal connection")). For these reasons, the Motion for Summary Judgment is denied as to the Title VII retaliation claim in Count III.

### D.  EPA Sex Discrimination (Count IV)

In Count IV, Shawley claims that Jim Shorkey violated the EPA by paying her less for equal work than similarly situated male employees. ECF No. 1 ¶¶ 121-130.

Under the EPA, claims are evaluated based on a two-step burden-shifting paradigm. Johnson v. Fed. Exp. Corp., 604 F. App'x 183, 187 (3d Cir. 2015). First, the plaintiff must establish a prima facie case "by demonstrating that employees of the opposite sex were paid differently for performing 'equal work'—work of substantially equal skill, effort and responsibility, under similar working conditions." Id. (quoting Stanziale v. Jargowsky, 200 F.3d 101, 107 (3d Cir. 2000)). "The crucial finding on the equal work issue is whether the jobs to be compared have a 'common core' of tasks, i.e., whether a significant portion of the two jobs is identical." Steele v. Pelmor Laboratories, Inc., 642 F. App'x 129, 136 (3d Cir. 2016) (quoting Brobst v. Columbus Servs. Int'l, 761 F.2d 148, 156 (3d Cir. 1985)). "Factors to be considered in determining whether tasks are similar include whether they require a similar quality and quantity of production, education, relevant prior work experience, conduct, and skill." Id. (citing 29 C.F.R. § 1620.13).

If the Court finds there is a common core of tasks, "[t]he inquiry then turns to whether differing or additional tasks make the work substantially different." Gumbs v. Del. Dep't of Lab., 745 F. App'x 457, 460 (3d Cir. 2018) (quoting Brobst, 761 F.2d at 155). "[A] showing that the positions . . . were merely comparable, without more, is not sufficient to give rise to an inference that th[e] positions were 'equal' as that term is used in the [EPA]." Byrnes v. Herion, Inc., 764 F. Supp. 1026, 1030 (W.D. Pa. 1991).

"If plaintiff establishes her prima facie case, '[t]he burden of *persuasion* then shifts to the *employer* to demonstrate the applicability of one of the four affirmative defenses specified in the [EPA],' which include '(i) a bona fide seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex.'" Johnson, 604 F. App'x at 187 (quoting Stanziale, 200 F.3d at 107 & n. 6). "[I]n

order to prevail at the summary judgment stage, the employer must prove at least one affirmative defense so clearly that no rational jury could find to the contrary." Id. at 187-88 (quoting Stanziale, 200 F.3d at 107).

In support of its Motion for Summary Judgment, Jim Shorkey argues that Shawley's EPA claim fails because she cannot show she was paid less for "equal work." ECF No. 40 at 17. It argues that Shawley's two alleged comparators White, the IT Director, and Little, the PDR manager, performed different jobs than Shawley. Id.

In response, Shawley contends that the three employees performed "equal work." She argues that all three positions did not require any particular education, experience, or skill to be hired; they were all based out of the North Huntingdon location; Jim Shorkey III and Russell Shorkey maintained ultimate authority over setting all of their salaries; and they all supervised employees at times. ECF No. 42 at 20-26. Shawley also argues that her education and skill levels exceed those of her comparators. Id. at 21-22.

For the reasons that follow, the Court agrees with Jim Shorkey that Little and White did not perform "equal work" for purposes of Shawley's EPA claim. As a result, Shawley is unable to establish a prima facie case in support of her EPA claim.

### 1. Little

Little was the PDR Manager. In this role, Little trained others how to perform auto repairs and was responsible for repair orders. This required knowledge of how to perform certain repairs and training certifications from vendors.

Shawley's HR responsibilities, on the other hand, involved onboarding employees, enrollment of health benefits, conflict resolution, investigating allegations of misconduct; unemployment compensation claims; answering phone calls from employees; corporate

compliance; and handling ADA and FMLA claims.   Shawley supervised individuals in her department.   Her position required computer skills, including knowledge of the Microsoft Office suite.

Upon review, Shawley and Little's roles are not similar in relevant respects.   Other than broadly acting in managerial roles at the North Huntingdon location, Shawley does not point to any "common core" of tasks that she shared with Little.   Simply being in a supervisory, or management role does not constitute "equal work" for purposes of the EPA.   See, e.g., Puchakjian v. Twp. of Winslow, 804 F. Supp. 2d 288, 298-99 (D.N.J. 2011) ("Supervision of employees and a title of department head . . . are not sufficient to render positions substantially equal."); Keich v. Worldwide Express Holdings, LLC, No. 5:19-cv-02764, 2020 WL 6262189, at *3 (E.D. Pa. Oct. 23, 2020) ("Many management-level employees supervise employees, but not all management-level employees are comparable under the EPA.").

While Plaintiff argues that both roles (HR Director and PDR Manager) similarly did not require any particular skills or qualifications to be hired, this does not appear to be supported by the record.   The parties agree that "in order to be PDR Manager, [Little] needed to know how to perform PDR and train others to perform the repairs," and that "he was sent to school to obtain certifications from the various vendors in order to perform the repairs."   ECF No. 37 ¶ 34. Shawley's HR role did not require similar skills.

Nevertheless, "equal skill alone" does not establish an EPA claim where, as here, the roles do not share overlapping responsibilities.   Keich, 2020 WL 6262189, at *3.   In Keich, for example, the court considered whether two positions, Director of Credit and Collections and Director of Sales involved equal work under the EPA.   Although there was evidence that the two positions involved "substantially equal skills" and "a common core of skills," the court found that plaintiff

could not establish her EPA claim because she presented no evidence that the two positions "shared overlapping responsibilities."  Id.

Similarly, here, the HR Director and PDR Manager roles involve fundamentally different, non-overlapping tasks.  Little's role involved auto repair orders and training workers to perform those repairs, whereas Shawley was responsible for a variety of HR-related tasks.  For these reasons, the Court finds that Little is not a valid comparator for purposes of Plaintiff's EPA claim.

### 2.   White

White was the IT Director.  As the IT Director, he was the administrator for the CDK software.  His duties included answering IT tickets for employees with computer, email, fax or phone issues, and assisting in special projects to set up software, computers and phones for new dealerships.  Id. ¶ 31.  His direct supervisor was Russell Shorkey.  Id. ¶ 31.  White did not have any subordinates.  ECF No. 43 ¶ 89.

Upon review, the Court also finds that White is not a valid comparator.  Again, Shawley does not present evidence that she shared a "common core" of tasks with White.  In addition to their roles involving different tasks, the IT Director worked in a different department, reported to a different supervisor, and did not similarly supervise any employees.  Indeed, Shawley testified that the IT Director was a different job, involving a different skill set, than the HR Director.  ECF No. 37 ¶ 33.  While the two roles may be broadly comparable, in that they are department head roles involving a support function, "mere comparability of positions is not sufficient" under the EPA.  Welde v. Tetley, Inc., 864 F. Supp. 440, 442 (M.D. Pa. 1994); see also Frintner v. TruePosition, 892 F. Supp. 2d 699, 712 (E.D. Pa. 2012) (male employees were not valid comparators under EPA where they had jobs that bore "some similarity" with plaintiff's when

"taking a broad view," but plaintiff could not show that "overlapping tasks made up a significant portion" of their respective jobs). Thus, White's position is distinguishable.

Because White and Little are not valid comparators, Shawley cannot establish a prima facie case in support of her EPA claim. Therefore, the Motion for Summary Judgment is granted relative to Plaintiff's EPA claim in Count IV.

### E.  EPA Retaliation (Count V)

In Count V, Shawley claims that Jim Shorkey retaliated against her under the EPA for complaining about disparate pay as to two similarly situated male employees. ECF No. 1 ¶¶ 131-142. The EPA is part of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq*. Under the FLSA, it is prohibited to retaliate against any employee who files a complaint, commences a proceeding, or testifies in a proceeding under the FLSA, including the EPA. 29 U.S.C. § 215(a)(3).

To establish a prima facie case for retaliation under the FLSA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. Jones v. Amerihealth Caritas, 95 F. Supp. 3d 807, 814 (E.D. Pa. 2015).

In support of its Motion for Summary Judgment, Jim Shorkey argues that Shawley cannot establish a nexus or causal link between her complaint about unequal compensation and her alleged termination. ECF No. 40 at 22-23. There are minor differences between the FLSA and Title VII standards for retaliation, but third element of the prima facie case, causal connection, is the same as to retaliation claims under both statutes. Newsome v. City of Phila., No.19-5590, 2021 WL 2810289, at *2 n.2 (E.D. Pa. July 6, 2021). Here, Shawley's EPA retaliation claim arises out of the same operative facts as Shawley's Title VII retaliation claim. For the reasons discussed above,

the Court finds that Shawley presents sufficient evidence of a causal connection and temporal proximity between Shawley's complaint of disparate pay on May 16, 2018 (the protected conduct) and termination on June 12, 2018 (the adverse employment action) to withstand summary judgment.  Therefore, the Motion for Summary Judgment is denied as to Count V.

## IV.    CONCLUSION

For these reasons, the Motion for Summary Judgment, ECF No. 39, is granted in part and denied in part.

The Motion for Summary Judgment is granted as to Count II (Disability Discrimination under the ADA) and Count IV (Sex Discrimination under the EPA).  The Motion for Summary Judgment is otherwise denied.

An appropriate Order will be entered.

Dated: May 16 , 2022

BY THE COURT:

MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

cc: All counsel of record via CM/ECF.

29